INMAN, Judge.
 

 *438
 
 Robin Lee Hewitt, individually and as trustee of the Robin Lee Hewitt Revocable Trust ("Defendant"), appeals a judgment resulting from a jury verdict in favor of Gail Lee Hewitt ("Plaintiff") on a claim of constructive fraud. Defendant contends the trial court erred in denying her motions for directed verdict and her motion from judgment notwithstanding the verdict (JNOV), or in the alternative, motion for a new trial. After careful review, we hold that the trial court erred in denying the motions for directed verdict and JNOV, and reverse the judgment.
 

 I. Factual & Procedural Background
 

 This appeal arises out of a 2010 sale of property located in Brunswick County ("the Transaction") from Plaintiff and her late husband, Douglas Hewitt ("Mr. Hewitt") (collectively, "the Hewitts"), to their daughter, Defendant. The evidence at trial, considered in the light most favorable to Plaintiff, tends to show the following:
 

 Defendant is one of the Hewitts' three daughters. At age sixteen, Defendant left the family home. She lived in California for twenty-seven years preceding the Transaction.
 

 In 1987, the Hewitts purchased a tract of land in Supply, North Carolina from Mr. Hewitt's mother, Mary Hewitt. The deed explicitly reserved a life estate for Mary Hewitt in the property. Following the death of Mary Hewitt, the Hewitts built a new house ("the Property") on the land in 2005.
 

 In May 2009, the Hewitts decided to enter a home equity conversion mortgage, also known as a reverse mortgage, on the Property. Attorney Richard Green ("Green") and his closing coordinator, Rhonda Caison ("Caison"), represented the Hewitts in the closing. Green was "trusted lawyer" and "friend" of Plaintiff, whom she had known for fifteen years and felt "confident" using. The Hewitts attended counseling sessions through a federal government agency and received informational documents regarding the loan's cost and the financial implications. On 12 June 2009, the Hewitts entered into the reverse mortgage from which they received a loan for $168,000 from RBC Bank, borrowed against their equity in the Property. At the time they entered into the reverse mortgage closing, an $80,989.52 lien on the Property with Chase Home Mortgage was recorded.
 

 In closing on the reverse mortgage, the Hewitts received the proceeds of the loan from RBC Bank, retired the debt to Chase
 
 *798
 
 Home Bank, placed a new deed of trust on the record, and signed a new promissory note securing the new loan. The note was payable 2 May 2086. The loan
 
 *439
 
 covered the $8,446 closing costs, provided the Hewitts a loan advance of $25,880.70, and allowed them to remain in their home, without making mortgage payments, for the rest of their lives. In the event that either spouse lived away from the Property for over a year, the Property was sold, or both spouses died, the reverse mortgage would terminate and the loan would become due. The Hewitts remained responsible for paying the maintenance, insurance, and taxes on the Property.
 

 At the time the Hewitts entered into the reverse mortgage, Defendant lived in California. She allegedly told her parents by phone that the reverse mortgage was a "big mistake." However, Plaintiff admitted that she also received "advice independent of [Defendant] on whether or not the reverse mortgage was a good deal[.]"
 

 In May or June of 2010, in a telephone conversation from her residence in California, Defendant offered to buy the Property from her parents. Defendant stated she could buy the Property the following year, allegedly telling her parents that "[the house] will still be in the family," "you'll be okay[,]" and "[e]verything will be the same except that I'll own the house." A few months later, in September or October of 2010, Defendant called her parents and said she was prepared to purchase the Property.
 

 Plaintiff investigated the value of the Property in anticipation of selling it to Defendant. She consulted "four or five" real estate agencies but never requested a professional appraisal. Plaintiff referred Defendant to Green to prepare the documentation for the sale of the Property.
 

 On 4 October 2010, Defendant contacted Green's office and spoke with Caison, the closing coordinator. Later that day, Defendant confirmed her conversation with Caison by email, stating, "Let me know what steps I need to take next for the title company and for the purchasing contract for the property." Caison responded by email stating, "I will handle the title company from here and order your title policy.... I'll prepare the contract and forward it to you in an e-mail."
 

 Green's office prepared all of the documentation regarding the Transaction, including,
 
 inter alia
 
 , the Offer to Purchase and Contract (the "Purchase Contract"), the General Warranty Deed (the "Deed"), and the settlement sheet listing all financial terms of the Transaction. The Purchase Contract listed the Property's purchase price as $126,000.
 

 Defendant signed The Purchase Contract in California on 11 October 2010 and sent it to North Carolina. The Hewitts signed the Purchase Contract at home on 13 October 2010 and delivered it to Green's office.
 

 *440
 
 Plaintiff and Defendant never expressly discussed the terms of the Purchase Contract. Plaintiff admitted that no one ever misled her about the contents of the Purchase Contract.
 
 [1]
 
 Five days later, on 18 October 2010, as a condition of a mortgage loan Defendant obtained for the purchase, the Property was appraised at $131,000.
 

 On 10 November 2010, Plaintiff personally retrieved the Deed and other remaining transactional documents from Green's office to take home for signing, as Mr. Hewitt was unable to leave their residence. At that time, Plaintiff allegedly asked Green if they were going to be okay signing the papers, and Green said, "I can't tell you if it's a good move or a bad move ... but I see nothing wrong." Green testified that he considered both Plaintiff and Defendant his clients.
 

 The Hewitts signed the Deed later that day and a neighbor notarized their signatures. The Deed was recorded on 17 November 2010 in the Brunswick County Registry.
 

 *799
 
 Plaintiff testified that she mistakenly believed the life estate reserved in the 1987 deed to Mary Hewitt, her mother-in-law, also granted Plaintiff a life estate in the Property. Plaintiff testified that, "I thought that basically there was something that said in writing that we had a life estate." However, neither the executed Purchase Contract nor the Deed included any mention of a life estate. Plaintiff admitted that she had the opportunity to read the documents regarding the Transaction. Defendant testified that she would not have purchased the Property with a life estate reservation. The settlement sheet summarizing the Transaction reflects that Defendant purchased the Hewitts' home for $126,000, and paid $126,472.34 to pay off the reverse mortgage.
 

 Following the closing, Defendant paid the new mortgage, taxes, and insurance on the Property. Plaintiff changed her insurance policy to a tenant's policy and referred to Defendant as her "landlord."
 

 Defendant moved from California to Brunswick County shortly after the closing, on the day after Thanksgiving of 2010. Defendant
 
 *441
 
 cared for her father until his death two years later on 11 February 2013. Following her father's death, Defendant no longer felt she had a purpose in Brunswick County. Just after Christmas in December 2013, Defendant expressed her desire to sell the Property and move back to California.
 

 Plaintiff filed the complaint initiating this action on 2 June 2014 alleging fraud, fraud in the inducement, and constructive fraud. Following discovery, Defendant filed a motion for summary judgment and Plaintiff filed a cross-motion for summary judgment. On 30 April 2015, the trial court denied Plaintiff's motion, granted Defendant's motion as to the claims for fraud and fraud in the inducement, and denied Defendant's motion as to the constructive fraud claim.
 

 The case came on for trial on 29 June 2015, Judge Ebern T. Watson, III, presiding. At the close of Plaintiff's evidence, Defendant moved for a directed verdict, which the trial court denied. Defendant renewed the motion for directed verdict at the close of all the evidence, and the trial court again denied the motion. The jury returned a verdict in favor of Plaintiff and on 20 July 2015, the trial court entered a judgment for constructive trust.
 

 Defendant filed a motion for JNOV or, in the alternative, a new trial on 23 July 2015. On 6 August 2015, the trial court denied Defendant's motion. Defendant timely filed a notice of appeal.
 

 II. Analysis
 

 Defendant argues the trial court erred in denying her motions for directed verdict, JNOV or, in the alternative, motion for new trial. After careful review of the record and applicable law, we agree.
 

 "On appeal the standard of review for a JNOV is the same as that for a directed verdict, that is whether the evidence was sufficient to go to the jury."
 
 Tomika Invs., Inc. v. Macedonia True Vine Pentecostal Holiness Church of God Inc.
 
 ,
 
 136 N.C.App. 493
 
 , 498-99,
 
 524 S.E.2d 591
 
 , 595 (2000) (citation omitted). We review the ruling
 
 de novo.
 

 Maxwell v. Michael P. Doyle, Inc.
 
 ,
 
 164 N.C.App. 319
 
 , 323,
 
 595 S.E.2d 759
 
 , 761 (2004) ("Because the trial court's ruling on a motion for a directed verdict addressing the sufficiency of the evidence presents a question of law, it is reviewed
 
 de novo.
 
 ").
 

 "In determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant[.]"
 
 Turner v. Duke Univ.
 
 ,
 
 325 N.C. 152
 
 , 158,
 
 381 S.E.2d 706
 
 , 710 (1989). The non-movant is given "the benefit
 
 *442
 
 of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor."
 
 Id.
 
 at 158,
 
 381 S.E.2d at 710
 
 . "A motion for either a directed verdict or JNOV should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's claim."
 
 Shelton v. Steelcase, Inc.
 
 ,
 
 197 N.C.App. 404
 
 , 410,
 
 677 S.E.2d 485
 
 , 491 (2009) (citations and quotation marks omitted). "However, if [the] plaintiff fails to present evidence of each element of his claim for relief, the claim will not survive a directed
 
 *800
 
 verdict motion."
 
 Ridenhour v. Int'l Bus. Mach. Corp.
 
 ,
 
 132 N.C.App. 563
 
 , 566,
 
 512 S.E.2d 774
 
 , 777 (1999) (citation omitted).
 

 The North Carolina Supreme Court has defined the elements of a constructive fraud claim as proof of circumstances "(1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff."
 
 Terry v. Terry
 
 ,
 
 302 N.C. 77
 
 , 83,
 
 273 S.E.2d 674
 
 , 677 (1981) (quotation marks, citations, and brackets omitted). This Court has defined the essential elements of constructive fraud in slightly different formulations.
 
 See
 

 Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.
 
 ,
 
 219 N.C.App. 615
 
 , 620,
 
 730 S.E.2d 763
 
 , 767 (2012) ("To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction.");
 
 White v. Consol. Planning, Inc.
 
 ,
 
 166 N.C.App. 283
 
 , 294,
 
 603 S.E.2d 147
 
 , 156 (2004) (defining the elements of constructive fraud as "(1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured");
 
 Keener Lumber Co. v. Perry
 
 ,
 
 149 N.C.App. 19
 
 , 28,
 
 560 S.E.2d 817
 
 , 823 (2002) (defining the elements of constructive fraud as "(1) the existence of a fiduciary duty, and (2) a breach of that duty"). Although the stated elements vary, each holding requires that the defendant exploits or seeks to exploit the relationship to his or her advantage.
 

 "A number of relationships have been held to be inherently fiduciary, including the relationships between spouses, attorney and client, trustee and beneficiary, members of a partnership and physician and patient."
 
 King v. Bryant
 
 , --- N.C. ----, ----,
 
 795 S.E.2d 340
 
 , 349 (2017). "The very nature of [these] relationships ... gives rise to a fiduciary relationship as a matter of law."
 
 CommScope Credit Union v. Butler & Burke, LLP
 
 ,
 
 369 N.C. 48
 
 , 52,
 
 790 S.E.2d 657
 
 , 660 (2016). However, "[a] confidential or fiduciary relation can exist under a variety of circumstances and is not
 
 *443
 
 limited to those persons who also stand in some recognized legal relationship to each other[.]"
 
 Stilwell v. Walden
 
 ,
 
 70 N.C.App. 543
 
 , 546-47,
 
 320 S.E.2d 329
 
 , 331 (1984). A fiduciary relationship can exist as a matter of fact in those circumstances "in which there is confidence reposed on one side, and resulting domination and influence on the other."
 
 Abbitt v. Gregory
 
 ,
 
 201 N.C. 577
 
 , 598,
 
 160 S.E. 896
 
 , 906 (1931). The North Carolina Supreme Court recently reaffirmed this principle in
 
 King v. Bryant
 
 , noting that "[i]t is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other." --- N.C. at ----,
 
 795 S.E.2d at 349
 
 (quoting
 
 Abbitt
 
 ,
 
 201 N.C. at 598
 
 ,
 
 160 S.E. at
 
 906-07 ).
 

 "Generally, the existence of a [fiduciary relationship as a matter of fact] is determined by specific facts and circumstances, and is thus a question of fact for the jury."
 
 Stamm v. Salomon
 
 ,
 
 144 N.C.App. 672
 
 , 680,
 
 551 S.E.2d 152
 
 , 158 (2001). However, the trial court, and this Court on appeal, must determine as a matter of law whether the evidence is sufficient to submit the issue to the jury.
 
 See
 

 Maxwell
 
 ,
 
 164 N.C.App. at 323
 
 ,
 
 595 S.E.2d at 761
 
 .
 

 Plaintiff argues that a close relationship with family members can suffice to establish a confidential or fiduciary relationship. Although a close family relationship can serve as a factor for consideration in this analysis, the relationship of parent and child does not as a matter of law create a confidential or fiduciary relationship.
 
 See
 

 Davis v. Davis
 
 ,
 
 236 N.C. 208
 
 , 211,
 
 72 S.E.2d 414
 
 , 416 (1952) (holding that the parent-child relationship "is a family relationship, not a fiduciary one, and such relationship does not raise a presumption of fraud or undue influence");
 
 see also
 

 Benfield v. Costner
 
 ,
 
 67 N.C.App. 444
 
 , 446,
 
 313 S.E.2d 203
 
 , 205 (1984) (holding that "[a]n allegation of a 'mere family relationship' is not particular enough to establish a confidential or fiduciary relationship").
 

 In
 
 Curl v. Key
 
 ,
 
 311 N.C. 259
 
 , 261,
 
 316 S.E.2d 272
 
 , 274 (1984), the plaintiffs, siblings
 
 *801
 
 ages 16, 17, 18, and 21, inherited their family home following the death of their father. The defendant was the late father's best friend, known to the plaintiffs as "Uncle Jack," who lived in the family home with the plaintiffs.
 
 Id.
 
 at 262-63,
 
 316 S.E.2d at 274-75
 
 . Upon inheriting the house, the plaintiffs were threatened, harassed, and occasionally physically abused by other relatives.
 
 Id.
 
 at 261,
 
 316 S.E.2d at 274
 
 . The defendant told the plaintiffs that he would keep their relatives away if they signed a "peace paper" giving him the right to kick troublemakers off the property.
 
 Id.
 
 at 262,
 
 316 S.E.2d at 274
 
 . After signing the "peace paper," the plaintiffs discovered that they had actually signed a deed to
 
 *444
 
 their home, and brought an action to set aside the deed.
 
 Id.
 
 at 260,
 
 316 S.E.2d at 273
 
 . The North Carolina Supreme Court held that the plaintiffs had produced sufficient evidence that, at the time the plaintiffs executed the deed to the defendant, a confidential or fiduciary relationship existed between the plaintiffs and the defendant.
 
 Id.
 
 at 263,
 
 316 S.E.2d at 275
 
 .
 

 In
 
 Willetts v. Willetts
 
 ,
 
 254 N.C. 136
 
 , 138,
 
 118 S.E.2d 548
 
 , 549 (1961), the plaintiff, who was in debt and unable to obtain refinancing, made an agreement with his son, the defendant, wherein (1) the father would deliver a deed conveying his real property to his son; (2) the son would obtain a loan secured by the property; (3) the son would pay off his father's debt; and (4) the son would then reconvey the real property to his father, who would assume the outstanding mortgage.
 
 Id.
 
 at 138,
 
 118 S.E.2d at 549
 
 . The son acquired a loan using the real property as security, repaid his father's debt, but never conveyed the property back to his father.
 
 Id.
 
 at 138,
 
 118 S.E.2d at 549
 
 . The North Carolina Supreme Court noted that the trial court found that the son had assisted his father in farming and marketing his livestock and crops, and the son was listed as "agent" for his father's tax listing.
 
 Id.
 
 at 139,
 
 118 S.E.2d at 550
 
 . The Supreme Court also noted that there was no evidence that the father was mentally or physically incapable of transacting business at the time he executed the deed.
 
 Id.
 
 at 142,
 
 118 S.E.2d at 552
 
 . Noting that "[t]he evidence leaves the impression that all [the] defendant did was to assist his father when called upon to do so[,]" the Court held that "[t]here is no evidence tending to show any incident or transaction either before or after the execution and delivery of the subject deed in which [the] defendant exercised or attempted to exercise a dominating influence over his father."
 
 Id.
 
 at 142,
 
 118 S.E.2d at 552
 
 .
 

 Here, the relationship between Plaintiff and Defendant is dissimilar to the confidential relationship found in
 
 Curl
 
 and analogous to the parent-child relationship in
 
 Willetts
 
 , which the Supreme Court held was insufficient to establish a confidential relationship. Unlike the defendant in
 
 Curl
 
 , who was living with the young plaintiffs when they signed the deed, Defendant here was living in California more than 3,000 miles away from Plaintiff, and had lived there for twenty-seven years preceding the Transaction. During the decade immediately preceding the Transaction, Defendant visited Plaintiff "somewhere between three and eight" times,
 
 i.e.
 
 less frequently than once a year. Defendant planned the Hewitts' fiftieth wedding anniversary party in 2005 and occasionally traveled with her parents. Plaintiff explained that her relationship with Defendant
 

 is one that we trusted her. We had such faith in her, because she was the most independent of our children. She never
 
 *445
 
 asked for anything. She never broke a promise. She was always the one to keep us apprized [sic] of what was going on with her life, her promotions through business, one that we never found even the slightest glimmer of there being any reason to not have anything but pride and love and affection.
 

 Plaintiff's own account of her relationship with her daughter, while endearing, in no way indicates that Defendant exploited or attempted to exploit the relationship for her benefit. Plaintiff admitted that at the time of the Transaction, she was legally and financially independent of Defendant, and Defendant was "totally independent" of her parents. Plaintiff also admitted that the only business transaction she had with Defendant was the sale of the Property, that Defendant never had any control over Plaintiff's finances,
 
 *802
 
 and that Defendant did not dominate Plaintiff.
 

 Also, Plaintiff admitted she was a "sharp" woman, a high school graduate who had worked as an office administrator in her husband's business for forty-five years. Prior to the Transaction, Plaintiff "sought other advice," and Mr. Hewitt "spoke to several of his friends[.]" Plaintiff investigated the value of the Property prior to the Transaction. Plaintiff referred Defendant to Green, an attorney whom she knew and trusted, to prepare the necessary documentation. Plaintiff and Mr. Hewitt signed the Purchase Contract, which specified the express terms of the Transaction, and, approximately one month later, signed the Deed. As in
 
 Willetts
 
 , Plaintiff presented no evidence that at the time of the Transaction, she was physically or mentally incapable of conducting her own business or that Defendant exercised or attempted to exercise any dominating influence over Plaintiff.
 

 Additionally, Defendant was in California at the time that the Hewitts signed the Purchase Contract and the Deed. Defendant paid $126,000 for the Property, over 96% of the value of the professional appraisal. It was only
 
 after
 
 the Transaction that Defendant returned to North Carolina and began to see Plaintiff regularly, in the course of caring for Mr. Hewitt. Plaintiff failed to present any evidence that at the time she signed the Purchase Contract or at the time she signed the Deed that she was in a position to be taken advantage of or that "[D]efendant exercised or attempted to exercise a dominating influence over [her]."
 
 Willetts
 
 ,
 
 254 N.C. at 142
 
 ,
 
 118 S.E.2d at 552
 
 .
 

 In sum, a careful review of the record reveals no requisite scintilla of evidence that at the time of the Transaction, Plaintiff and Defendant were in a relationship of trust and confidence that Defendant exploited
 
 *446
 
 or attempted to exploit to take advantage of Plaintiff. Plaintiff's evidence, even when considered in the light most favorable to her, giving her the benefit of all reasonable inferences and resolving all conflicts in her favor, fails to satisfy the essential elements of the constructive fraud claim. We therefore hold that the trial court erred in denying Defendant's motions for directed verdict and JNOV.
 

 Defendant also argues that the trial court erred in failing to give her requested special jury instructions. Because we hold the trial court erred in denying Defendant's motions for directed verdict and JNOV and reverse the trial court's judgment, we need not address this issue on appeal.
 

 III. Conclusion
 

 Because Plaintiff failed to present even a scintilla of evidence of a fiduciary relationship or a relationship of trust and confidence which Defendant exercised or attempted to exercise to her benefit, we hold that the trial court erred in denying Defendant's motions for directed verdict and JNOV. Accordingly, we reverse the trial court and remand for entry of judgment consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 Judges BRYANT and TYSON concur.
 

 [1]
 

 A post-it note written in Green's handwriting affixed to an undated, unsigned draft of the Purchase Contract reads, "M and D to have life estate." Green testified that he never communicated with Defendant and was certain that Caison never told him that the Hewitts intended to reserve a life estate in the Property. He said that he could not recall the reason he wrote the note, but assumed that Plaintiff had informed him of her desire to have a life estate in the Property. He did not recall relaying that information to Caison or anyone else. Neither the unsigned draft nor the executed Purchase Contract-or any other document introduced in evidence-referred to the conveyance reserving a life estate for the grantors.